UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BOSTON SEMI EQUIPMENT LLC,

                                    Plaintiff,

                -against-

TERADYNE, INC.

                                    Defendant.

Index No.:

COMPLAINT

**JURY TRIAL DEMANDED**

Plaintiff Boston Semi Equipment LLC[1] ("BSE") brings this antitrust action for injunctive relief and treble damages against defendant Teradyne, Inc. ("Teradyne") and alleges, based on personal knowledge as to its own acts and otherwise based on information and belief, the following claims for Teradyne's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Massachusetts state laws for tortious interference with prospective business relations, tortious interference with existing contracts, restraint of trade and tying (M.G.L. c. 93, §§ 4 and 5), and unfair competition and unfair and deceptive trade acts and practices, (M.G.L. c. 93A, §§ 2 and 11).

---

[1]    BSE was founded in 2010 as part of the leveraged buyout of Test Advantage Hardware, LLC.  For avoidance of doubt all references to BSE herein should be deemed to refer to all of BSE's subsidiaries and predecessor entities, including, but not limited to Test Advantage Hardware, LLC, Microstats and Test Advantage, Inc.

## BACKGROUND AND SUMMARY OF
## TERADYNE'S ANTICOMPETITIVE CONDUCT

1.      Teradyne, a supplier of automatic test equipment ("ATEs") to producers of silicon-based semiconductor chips and integrated circuits ("Chip Manufacturers"), has implemented an illicit scheme to exclude BSE from competing in the following relevant markets where customers are locked into using Teradyne ATEs[2]: (i) sales of ATEs and ATE components to customers who only use one brand of ATEs; and, (ii) sales of ATEs and ATE components to customers who, despite using more than one brand of ATEs in their business, need to add additional capacity to use in manufacturing programs along with an existing stock of Teradyne ATEs (collectively, the "Locked-in Relevant Markets").  Teradyne also has exploited its monopoly position in repair services for Teradyne ATEs (the "Service Market") to exclude BSE from competing in that market as well.  The Locked-in Relevant Markets and the Service Market are both global in scope.

2.      Teradyne has undertaken to exclude BSE from the Locked-in Relevant Markets and the Service Market in order to protect its dominant position and thwart competition from BSE.  Teradyne's primary business is the design, manufacture, and sale of new ATEs.  BSE's primary business is the acquisition, reconfiguration[3] and resale of Teradyne ATEs.  Secondarily, BSE provides repair services to owners of Teradyne ATEs.

---

[2]     Single-brand customers, which constitute all but a handful of the largest customers, represent over 70% of installed capacity worldwide.

[3]     In the chip manufacturing sector, reconfiguration services are typically referred to as refurbishment and the resulting sales of reconfigured tools are referred to as sales of refurbished tools.  Unlike ATEs, tools that are used earlier in the manufacturing process perform physical manufacturing functions and these used tools require significant refurbishment (*i.e.*, in which a tool is reconditioned and parts are replaced to better perform their intended function).  Refurbishment of used ATEs is typically limited to cleaning and the replacement of worn cables, representing only approximately 10% of the value of a reconfigured ATE.  Because reconfiguration, in which an ATE is altered in terms of its constituent components or is otherwise

(Footnote continued on next page)

3.      Teradyne has engaged in a pattern of exclusionary conduct, culminating in its refusal to sell to BSE any of the essential components[4] needed to reconfigure Teradyne ATEs, abruptly reversing a more than fifteen-year profitable relationship between the two companies. Over the course of this fifteen-year relationship, BSE has purchased millions of dollars of components from Teradyne at full new list prices.  Teradyne's sales to BSE were therefore always profitable.  Teradyne had no legitimate business purpose in ending this profitable arrangement, other than the anticompetitive exclusion of BSE from the relevant markets.

4.      ATEs are highly customizable tools, which must be specifically configured to test a particular chip design.  In relevant part, a properly configured ATE will contain a specific number and type of "instrument boards,"[5] and each such board must be set to operate at the correct level of functionality in order for the ATE to perform its intended primary function, namely, the testing of specific finished chips for defects at the end of the manufacturing process.

5.      All ATEs that work on a single program[6] must be of the same brand, model and configuration in order to interface correctly with the rest of the ATEs in the program and successfully test the chip being made.  ATEs that do not exactly match the program's specifications cannot be used.  It is common, if not routine, for customers to have many

---

(Footnote continued from prior page)
provided with different or upgraded instrument boards so that it can test a different chip, comprises the vast majority of the value of BSE's services, these machines are referred to herein as "reconfigured" ATEs.

[4]   These components consist of, primarily, instrument boards, host computers, cables, and various Encryption Keys (as defined *infra* at Paragraph 42).

[5]   Instrument boards are the operating center of an ATE.  Each board is comprised of hundreds of individual parts, most of which are commodity-type items.  As discussed *infra* at Paragraphs 40 to 47, instrument boards vary in type and function.

[6]   A "program" is, in essence, a single production line designed to manufacture a specific chip.

identically configured ATEs simultaneously running on a single program.  It is also common, if not routine, for customers to have to add significant numbers of identically configured ATEs, following the initial setup of the program, to meet rising consumer demand.

6.      Since approximately 1997, BSE has served its Chip Manufacturer customers primarily by (i) adding additional reconfigured Teradyne ATEs to existing programs to enable the customer to increase production capacity; and, (ii) purchasing used Teradyne ATEs that are no longer needed by a Chip Manufacturer.  Until recently, Teradyne chose not to compete with BSE in either activity.  Specifically, until approximately 2009, Teradyne sought only to sell new ATEs and new components, ceding the business of reconfiguring used Teradyne ATEs to third parties such as BSE.  Over time, BSE evolved into the largest, and indeed the only global, provider of reconfigured Teradyne ATEs.

7.      In addition, although it offers repair services to its customers, Teradyne routinely terminates its repair services for certain Teradyne ATE models that it has stopped manufacturing ("Legacy Models").  Chip Manufacturers that own Legacy Models are therefore forced either to purchase new ATEs from Teradyne or to turn to third parties to repair their equipment for the balance of the ATE's useful life.  In or about 2009, BSE began offering repair services to owners of such Legacy Models.

8.      If BSE does not have in stock the components it needs to reconfigure a Teradyne ATE, it must source those components directly from Teradyne.  When BSE requires such a component for a particular project, its historical practice has been to submit a purchase order to Teradyne for the necessary component(s), for which it pays the full new list price. Teradyne earns margins of between 50% and 100% on those sales.  Prior to January 16, 2013, Teradyne had never rejected a purchase order from BSE for any component it had in its

inventory.  In contrast to reconfiguration, BSE does not need to purchase anything from Teradyne to provide repair services to owners of Legacy Models.[7]

9.      As detailed in Paragraphs 90-93 and 96, *infra*, in or about April 2008, and following a decade of profitable interaction between Teradyne and BSE, Teradyne introduced a "Certification Program" and formally identified BSE as a "reliable source" for the purchase of reconfigured Teradyne ATEs.  Teradyne's Certification Program enabled customers to "add capacity with equipment [sourced from BSE] that [was] consistent with Teradyne quality standards."  As part of the Certification Program, BSE was authorized to sell reconfigured Teradyne ATEs to customers along with a Teradyne warranty.

10.      Less than two years later, on November 13, 2009, Teradyne abruptly terminated its Certification Program.  At or about the same time that it cancelled the Certification Program, Teradyne created a new division that focused exclusively on selling reconfigured ATEs, devoting personnel, plants, and capital to the project.

11.      Following its entry into reconfigured sales, Teradyne sought to drive BSE, its only significant competitor, from the Locked-in Relevant Markets altogether, notwithstanding the two companies' longstanding profitable relationship.  To further its anticompetitive scheme, Teradyne abused its monopoly position in the Service Market to compel its customers to deal exclusively with Teradyne—and not BSE—for reconfigured ATEs and further denied BSE access to components that were essential for reconfiguring Teradyne ATEs.  Teradyne also imposed contractual terms on its customers to prevent them from purchasing either reconfigured ATEs or repair services from BSE.

---

[7]      Repair services consist largely of repairing faulty instrument boards.  While instrument boards themselves can only be sourced from Teradyne, the parts needed to repair instrument boards for Legacy Models and older Current Models may be sourced on the open market.

12.     As detailed in Paragraphs 101-106, *infra*, Teradyne also abused its monopoly power in the Service Market by establishing an unprecedented "inspection" policy in or about 2009.  Under this policy, and in a significant departure from historical practices, Teradyne arbitrarily requires that all reconfigured ATEs purchased from third parties must be inspected at a significant and undefined fee before Teradyne will agree to include those ATEs under its service contracts.  Since the policy was announced, Teradyne has steadfastly refused to specify any criteria for its "inspection," thereby preventing anyone from being able to calculate the cost of any given inspection.  By instituting a policy that imposed artificial and undetermined costs on BSE's customers, Teradyne undermined BSE's ability to compete with Teradyne for reconfigured ATE sales.

13.     In or about 2009, when Teradyne announced this new inspection policy, its customers lacked meaningful alternatives to dealing with Teradyne for repairs, an essential service to which all Teradyne customers must have access.  Indeed, to this day, Teradyne still possesses monopoly power in the Service Market, with a share of approximately 95%.

14.     Teradyne was not concerned that its customers would respond to its new policy by switching to ATEs made by Advantest, the only other competitive manufacturer, because Teradyne customers have made substantial investments in, among other things, their fleets of Teradyne ATEs and spare components, as well as in training and qualifying their engineers on Teradyne ATEs.  Teradyne also knew that Advantest had similar policies and would not offer a more favorable business arrangement to its customers.  In Teradyne's view, its customers had "no alternative" to dealing with Teradyne.

15.     Threatened with the loss of its primary business, the sale of reconfigured Teradyne ATEs, BSE responded to Teradyne's "inspection" threats by expanding its in-house

repair service capabilities and offering its customers up to a two-year warranty for reconfigured ATEs purchased from BSE.  BSE also began to offer repair services to customers who owned unsupported Legacy Models.

16.     BSE's need to compete in the Service Market was thus a direct result of Teradyne's threat that it would not service reconfigured ATEs purchased from BSE without a comprehensive and undefined "inspection," which itself was part of Teradyne's anticompetitive scheme to exclude BSE from the selling reconfigured ATEs to Teradyne's customers.

17.     Teradyne responded to BSE's compelled entry into repair services by publicly defaming BSE, specifically telling customers that BSE's engineers were not qualified to repair Teradyne ATEs.  Teradyne's statements about BSE's capabilities and qualifications were meritless, and were contradicted by, among other things, BSE's employment of many former Teradyne engineers, Teradyne's longstanding relationship with BSE, and Teradyne's certification of BSE in 2008.

18.     Teradyne's threatened inspections cost BSE many sales opportunities, as customers sought to avoid the "inspection" requirement by dealing only with Teradyne.  Some customers, however, refused to be cowed by Teradyne's threats and insinuations about BSE's capabilities, and informed Teradyne that they intended to (i) purchase reconfigured ATEs from BSE; and, (ii) contract with BSE for repair services for those ATEs.

19.     Teradyne responded to these rebellious customers in two ways.  For some customers, Teradyne waived its "inspection" requirement and allowed the reconfigured ATE purchased from BSE to be included under those customers' Teradyne service contracts. Teradyne, however, took a stricter line with other customers, threatening to cut off all service offerings to those customers, including repair services for all of their non-Legacy Models

("Current Models").  Because Teradyne was the only service provider for Current Models, these customers cancelled their orders with BSE for reconfigured ATEs and their BSE repair service contracts, and were forced instead to contract for both with Teradyne.  Thus, while BSE was compelled to enter the Service Market to continue to compete in the Locked-In Relevant Markets, Teradyne took steps to ensure that BSE's repair services business was stunted from the start.

20.     In contrast to directives issued from Teradyne's Corporate Headquarters in Massachusetts to exclude BSE from the relevant markets, Teradyne's sales office in Japan saw BSE's entry into repair services as an opportunity to address a lingering customer service issue. Teradyne's practice of ending service support for Legacy Models had strained relations with several Japanese customers, who believed that they were entitled to support throughout the entire useful life of their ATEs.  These customers strongly objected to Teradyne's practice of ending support with at least five years (if not fifteen to twenty years) of useful life remaining in their ATEs.  Recognizing that Teradyne would not change its practice of ending service support before the end of an ATE's useful life and even though its customers could not reasonably switch to a competing ATE manufacturer, Teradyne's Japanese sales office tacitly consented to its customers' business arrangements with third parties to service their Legacy Models.

21.     As detailed in Paragraphs 131-141, *infra*, in 2012, BSE and Teradyne's Japanese sales office collaborated to address the concerns of one such Japanese customer, resulting in that customer's decision to divide its service contract for the last year of Teradyne support between Teradyne and BSE.

22.     Despite working cooperatively and positively for months with the customer on this issue, Teradyne Japan began to worry as to how senior management at

Teradyne's Corporate Headquarters in Massachusetts would react to the proposed split contract. This fear caused Teradyne Japan abruptly to reverse its position and demand that BSE withdraw its bid, threatening consequences on a global level if BSE did not comply.  BSE refused Teradyne's unlawful demand and the customer awarded the contract in January 2013 as it had intended:  BSE won 40% of the 2013 service contract at a price of $420,000, and Teradyne won the remainder.  Teradyne thereafter claimed that BSE's competition had cost it $600,000 in lost sales.

23.     Teradyne's reaction was swift.  Within 48 hours, Teradyne senior management notified BSE that, as of January 16, 2013, Teradyne would no longer do business with BSE (the "Lockout").  Although Teradyne claimed that the Lockout was the result of BSE's continued competition in the Service Market—the very competition that Teradyne itself had compelled—excluding BSE from competing in the Locked-In Relevant Markets was, of course, Teradyne's true objective.

24.     Since January 16, 2013, BSE has made numerous efforts to discuss the Lockout with Teradyne management.  Apart from confirming that it implemented the Lockout because of its objections to BSE's choosing "to operate as a direct competitor to Teradyne in the service" business that Teradyne feels "entitled" to as the manufacturer, Teradyne has to date refused to discuss the matter with BSE.

25.     In or about late February 2013, Teradyne publicly announced its Lockout of BSE.  Specifically, Teradyne circulated a notice (the "Lockout Notice" attached hereto as **Exhibit A**), which it distributed both internally and externally as part of its newsletter.  Teradyne emailed the newsletter, including the Lockout Notice, to each of its subsidiaries worldwide, as well as to individuals outside of the company.  The Lockout Notice announced that Teradyne

would not deal with BSE on any level and instructed all Teradyne personnel to stop all interactions with BSE.  Teradyne sales representatives quickly began showing the Lockout Notice to BSE's customers and others in the chip manufacturing sector.

26.     BSE seeks compensation for the harm it has suffered as a result of Teradyne's scheme and to ensure that there will be effective competition in the future by precluding Teradyne's impermissible efforts to exclude BSE from the Locked-In Relevant Markets and the Service Market.  As a result of the Lockout, BSE can no longer purchase the necessary components it needs to reconfigure ATEs for Teradyne customers.  BSE's customers, having seen the Lockout Notice, have begun to question whether BSE can meet their needs going forward.  BSE has lost numerous contracts over the last few months because of the Lockout and has been foreclosed from competing for many more.  BSE's reputation as a reliable source for reconfigured Teradyne ATEs has also been severely damaged.  Through its anticompetitive Lockout, Teradyne has also cut off BSE's ability to upgrade its current stock of instrument boards, significantly impairing the value of much of BSE's inventory.  Teradyne's exclusionary contracts and sales tactics have also prevented BSE from competing in the Service Market.

27.     Teradyne's exclusionary actions have stifled competition in the Locked-In Relevant Markets and the Service Market.  Teradyne's anticompetitive acts have, among other things, (i) caused customers to pay inflated prices for reconfigured Teradyne ATEs; (ii) caused customers to sell their used Teradyne ATEs at artificially depressed prices; (iii) forced customers to purchase new Teradyne ATEs where Teradyne has terminated support for their Legacy Models; and, (iv) substantially injured BSE's business in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Massachusetts state law.

**PARTIES, JURISDICTION, VENUE AND INTERSTATE COMMERCE**

28.    Plaintiff BSE is a limited liability company organized and existing under the laws of Delaware, with its principal place of business at 3 Burlington Woods Drive, Second Floor, Suite 2, Burlington, MA 01803.  BSE brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15, based on injuries it has suffered as a result of Teradyne's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for violations of various Massachusetts state laws.

29.    Defendant Teradyne is a corporation organized and existing under the laws of Massachusetts, and maintains its Corporate Headquarters at 600 Riverpark Drive, North Reading, MA 01864.

30.    This Court has original subject matter jurisdiction over BSE's Clayton Act claims and jurisdiction over the Defendant pursuant to 15 U.S.C. § 15, 28 U.S.C. §§ 1331 and/or 1337(a).  Plaintiff's state law claims arise out of the same set of facts, circumstances, occurrences and events as its Sherman Act claims and this Court therefore has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 and the principles of pendent jurisdiction.

31.    Teradyne maintains its Corporate Headquarters, has its principal place of business, and transacts business, in this District, and is therefore subject to the personal jurisdiction of this Court.  Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as pursuant to 28 U.S.C. §1391(b) and (c) because Teradyne resides in this District and a substantial part of the events or omissions giving rise to BSE's claims occurred in this District.

32.    Teradyne and BSE are engaged in interstate commerce and in activities substantially affecting interstate commerce.  The conduct alleged herein substantially affects interstate commerce.  Among other things, Chip Manufacturers located in the United States and elsewhere around the globe pay increased prices for ATEs and repair services for ATEs caused

by Teradyne's exclusionary conduct.  By increasing the cost of manufacturing chips, Teradyne's

exclusionary conduct has affected the price of myriad electronic products sold to consumers in

every state in the United States.

## CHIP MANUFACTURING AND AUTOMATIC TEST EQUIPMENT ("ATEs")

### *Silicon-Based Semiconductor Chips and Integrated Circuits*

33.     Silicon-based semiconductor chips and integrated circuits ("chips") are

used globally in a wide variety of products such as computers, cell phones, gaming platforms,

vehicles, home appliances, medical equipment, and many others.  Virtually all electronic products

that process data incorporate chips that have been tested during the manufacturing process using

ATEs of the sort made by Teradyne.

34.     Chips are fabricated on silicon wafers that yield multiple chips per wafer.

Since the early days of chip manufacture, technology has advanced such that many more chips may

be created simultaneously in continuously decreasing sizes.  The silicon wafer provides a base, over

which insulating and conducting materials are layered, along with switches and interconnecting

wires.

35.     Each chip design is unique, containing a specific combination of layers and

circuitry to enable it to function as the end application requires.  The manufacturing process or

"program," that is, the particular combination and configuration of machines and manufacturing

steps required, is similarly unique for each chip, and must be carefully designed and planned by

engineers to achieve the desired product.  Chips are manufactured in a variety of ways to many

different specifications depending on their intended end-use.  Simple, lower-cost devices (such as

appliance microcontrollers, operational amplifiers or voltage regulators) require less-sophisticated

chips than, for example, complex digital signal processors, microprocessors, and high-density and

high-speed memory devices.  Because of the many types of chips that are made and the variations in

manufacturing method, Teradyne's ATEs are customizable to meet each manufacturer's particular needs.

### *Automatic Test Equipment (ATEs)*

36.     At the end of the manufacturing process, all chips must be tested using ATEs.  Testing has three purposes.  First and foremost, testing allows a Chip Manufacturer to sort out functional chips from those that must be discarded.  Second, during the design and early manufacturing phases, testing finished chips helps Chip Manufacturers find ways to improve the product by identifying defects in the chips that can be addressed through adjustments to the manufacturing program.  Finally, variation in finished chips means that some chips are inherently of higher quality and perform better than others, even though they are manufactured following identical steps.  Testing helps identify higher-quality chips for which Chip Manufacturers can charge a premium over standard-quality chips.

37.     Teradyne competes with Advantest Corporation ("Advantest") in a functional duopoly for the global sales of new ATEs.  Global sales of new ATEs exceed approximately $2.5 billion annually.  A new ATE system, that is, a single unit, typically sells for $500,000 to $2 million and has an average useful life of at least fifteen years, and often can be used for upward of 25-30 years.

38.     The market for new ATEs is not competitive.  Reduced to a functional duopoly through years of highly consolidating mergers and acquisitions, Teradyne and Advantest each wield considerable market power and have a high degree of transparency into each other's competitive activities.  For this reason, as economic theory would predict, Teradyne and Advantest copy each other's rent-seeking behavior rather than seeking to compete on the basis of lower prices

or better service.  Indeed, customers have reported to BSE that Advantest has similar policies to those Teradyne policies that customers find objectionable.

39.     An "ATE" or "ATE system" principally consists of a core, a host computer, cabling and multiple instrument boards.  ATE systems may be reconfigured to test different chips through the purchase of additional hardware and passwords that enable, among other things, the ability to test chips with higher speeds and greater memory capacities.

40.     An ATE's instrument boards are what enable the machine to test chips: they are hardware boards containing circuitry, memory and microchips of their own that enable the ATE to run software programs on the chips being tested.

41.     The configuration of an individual ATE system refers primarily to the number, type and functionality of the instrument boards that the ATE contains.  Instrument boards are designed to test different chip functions.  Some instrument boards, for example, are tailored to test wireless communication devices with high frequency (communication speed) functionality, while other instrument boards are tailored to test automotive devices with increased voltage. Additionally, certain instrument boards are designed to test different levels of embedded memory functions within a chip.

42.     As is common in the electronics industry, Teradyne manufactures all its instrument boards to be capable of reaching multiple levels of functionality.  Teradyne controls the customer's ability to access these levels through the use of a single line of encrypted text (an "Encryption Key"), which is essentially a password that a customer can use to unlock additional functionality.  Customers can purchase Teradyne ATEs with more limited functionality at a lower cost to test chips requiring lower frequency or less memory; when later versions of that chip are released with higher frequency or memory requirements, for example, Chip Manufacturers can

purchase those specific Encryption Keys that are needed to unlock additional features of their various instrument boards needed to test these enhanced features of the new chip.

43.     The instrument boards and their associated Encryption Keys are transferable from one individual ATE to another. It is this feature that allows the ATEs to be reconfigured to be able to test different kinds of chips.  To keep track of these Encryption Keys, Teradyne associates each instrument board and its Encryption Keys with the ATE in which they are functioning. Because the Encryption Key is stored on the ATE's host computer, when a board is moved from one ATE to another, the associated Encryption Key must also be reassigned to its new host computer.  Recently, Teradyne has outsourced the registration function to a third-party vendor that maintains a website (the "Teradyne SSL") on which all instrument boards, their Encryption Keys and the ATEs they are associated with are recorded.  Customers, including BSE prior to January 16, 2013, could access the Teradyne SSL and perform transfers themselves.

44.     ATEs must be specifically configured for the precise chip to be tested. Specific configurations differ based on the number and type of instrument boards included in the system.  Each specific configuration will also specify the level and type of functionality needed for each instrument board.

45.     Accordingly, for each purchase order, a Chip Manufacturer must specify the exact configuration of ATE it needs for its program for manufacturing a specific chip.  The program design will specify which brand of ATE to use, the number and specific model of ATE needed, as well as the exact number and configuration of instrument boards that must be included on each ATE system ordered.  All chips manufactured for that program must be tested on the same brand and model of ATEs, configured exactly as specified by the Chip Manufacturer.

46.     ATEs that do not meet the exact configuration specified (brand, model, and number, type and functionality of included instrument boards) cannot test the chip to be produced under a specific program.  A particular chip, for example, one destined for a new model of cell phone expected to sell millions of units, will require a fleet of many identically-configured ATEs of the same brand and model working simultaneously.

47.     Teradyne ATEs can only be reconfigured using Teradyne components.  For example, instrument boards not manufactured by Teradyne will not work in a Teradyne ATE. Teradyne is also the sole source for Encryption Keys, which are essential for the reconfiguration process.

### TERADYNE CUSTOMERS ARE LOCKED IN

48.     Teradyne customers cannot retaliate against Teradyne's exploitative policies by moving their business to Advantest.  First, Teradyne customers have made substantial investments in supporting Teradyne ATEs in their plants.  Second, switching to Advantest would be ineffective, because Advantest, the only competitor to Teradyne in the market for new ATEs, has similar policies and would not offer Teradyne's customers a better deal.  Third, in the context of any given program, if consumer demand for the chip forces the Chip Manufacturer to expand capacity, the customer is completely locked into using not only the same brand, but the same configuration of the same model ATE.

49.     Most Chip Manufacturers (representing approximately 70% of installed ATE capacity) focus their purchases on only one ATE brand because of the prohibitively high cost of retraining and qualifying engineers, investing in an inventory of spare parts for an additional brand, and contracting for repair service from more than one company.  In today's marketplace, these costs force these Chip Manufacturers to select one ATE manufacturer from the global duopoly of Teradyne and Advantest.

50.     Moreover, as the average useful life of an ATE is at least fifteen years (if not 25-30 years), these Chip Manufacturers are locked into dealing exclusively with either Teradyne or Advantest for at least a decade or more because of the prohibitively high cost of switching brands.  Specifically, the costs of switching ATE brands at any time would include (i) the cost of switching out the Chip Manufacturer's installed base of ATEs (which can be comprised of dozens of, if not more than a hundred, ATEs costing upwards of $1.25 million each, new); (ii) the cost of engineers who must write new interface programs for the new ATEs; (iii) the cost of retraining and qualifying engineers on a new brand of ATE; (iv) the opportunity costs attendant to moving engineers off of new projects so that they can re-tool the current program; and, (v) the lost value of an inventory of spare components, especially instrument boards, which each cost upwards of $75,000 new.  Any one of these categories of costs could, by itself, render switching brands of ATEs cost-prohibitive.  Furthermore, switching between Teradyne and Advantest is often not a viable solution, as Teradyne and Advantest each maintain and follow similar policies and practices.

51.     Even Chip Manufacturers that use more than one brand of ATE are locked into dealing with Teradyne.  Specifically, once a Chip Manufacturer decides to use a Teradyne ATE in a particular manufacturing program, that Chip Manufacturer is forced either to continue to purchase additional or replacement Teradyne ATEs (so as to provide for seamless integration into the existing manufacturing program) or otherwise face substantial economic consequences of the resulting delays caused by having to re-engineer the program to incorporate a different brand of ATE.  A delay to a chip manufacturing program can prove fatal to the manufacturer's ability to win contracts in the future, as on-time delivery of chips is essential to competition in that market.  Any delay to the chip manufacturing process is often, for this reason, an insurmountable barrier to

switching ATE brands, or to purchasing used ATEs that are not specifically configured for the chip

manufacturing program.  Accordingly, a Chip Manufacturer that has already incorporated Teradyne

ATEs into a program has only two feasible options for adding or replacing ATE capacity:  (i)

purchase a new ATE from Teradyne; (ii) purchase a reconfigured ATE from Teradyne; or, (iii)

purchase a reconfigured ATE from BSE.  Virtually all, if not all, Teradyne customers add only the

same model and configuration of Teradyne ATEs to existing programs that already run on Teradyne

ATEs.  BSE is the only significant alternative to Teradyne for Teradyne customers, especially for

current generation Teradyne ATEs, which are in particularly high demand.

52.     Reconfigured ATEs cost Chip Manufacturers significantly less than new

ATEs purchased from Teradyne.  The amount of the new-to-reconfigured discount varies, but on

average, reconfigured ATEs sold by BSE save purchasers between 40% and 60% off the new ATE

price.

53.     By purchasing reconfigured ATEs from BSE, Chip Manufacturers reduce

their overall manufacturing costs, which more immediately results in lower upfront costs incurred

by the Chip Manufacturer and allows for increased cash flow as they create a new facility, or retool

or add capacity to an existing facility.

54.     In reconfiguring and selling reconfigured Teradyne ATEs, BSE directly

competes with Teradyne and restrains Teradyne's ability to force its customers to purchase new

ATEs before the end of their existing ATEs' useful lives.  This competition has also properly

constrained Teradyne's ability to sell only new ATEs to Chip Manufacturers and/or to escalate the

market price for both new and reconfigured ATEs.

55.     Even on the occasions when Teradyne has been unsuccessful in a bid to supply a reconfigured ATE to a Chip Manufacturer, it still generates a profit through sales of components to BSE, which are available exclusively from Teradyne.

56.     Without competition from BSE, Chip Manufacturers locked into using Teradyne ATEs could purchase only new ATEs from Teradyne or, if Teradyne opted to continue its reconfiguration business, reconfigured ATEs from Teradyne at Teradyne's prices (which are higher than BSE's).  In such a competition-free environment, Teradyne would be free to terminate its reconfigured ATE business altogether or minimize the price differential that currently exists between new and reconfigured ATE sales.  This would drive up costs for purchasers of ATEs in two ways: (i) they would be forced to pay higher prices for ATEs, whether new or reconfigured; and (ii) if Teradyne terminated its reconfiguration division, purchasers would lose the ability to sell their used ATEs, which are useless to other Chip Manufacturers without the reconfiguration services offered by BSE.

57.     Chip Manufacturers must also have a repair service solution for all of their ATEs.  If no such service is available or economically feasible, a Chip Manufacturer will be forced to purchase a new fleet of ATEs to replace those ATEs that it can no longer service.  BSE is also the only global alternative to Teradyne for the provision of comprehensive repair services on Legacy Models.  Indeed, BSE is often a customer's only option for providing repair services on Legacy Models, once Teradyne has ended formal support services for those ATEs.

58.     BSE repairs Legacy Models at lower prices than Teradyne routinely offers.

59.     Without BSE, Teradyne would be the only global provider of comprehensive repair services for Teradyne ATEs.  Many customers would therefore lack the ability to secure repair services for their Legacy Models.  Absent BSE's competition, owners of Legacy Models will

be forced to replace their ATEs with new ATEs before the end of their useful lives and at a substantially higher cost.

60.     Without BSE, Teradyne would also be the sole global purchaser of used Teradyne ATEs.  Today, Teradyne alone can set the market's residual price for used Teradyne ATEs being discarded or replaced by Chip Manufacturers, because without the ability to reconfigure these used ATEs, they are unusable by others.

61.     Thus, BSE's direct competition with Teradyne benefits not only Chip Manufacturers—through lower capital investment costs required to increase or retool their manufacturing facilities for new or additional chips—but also individual consumers worldwide, who benefit from lower product costs resulting from lower manufacturing costs of the chip component(s) in nearly every electronic product sold today.

62.     Teradyne customers, who purchased their ATEs with the understanding that BSE competed with Teradyne for sales of reconfigured ATEs and repair services, are now locked into dealing with Teradyne alone.  These customers, who based their lifecycle pricing of their current Teradyne ATEs (many of which will be usable for another decade or longer) on BSE's presence in the Locked-in Relevant Markets and the Service Market, now find themselves at the mercy of a monopolist.

## RELEVANT MARKETS

### *The Locked-In Relevant Markets*

63.     Teradyne has or will soon have monopoly power in each of the following relevant markets where customers are locked into using Teradyne ATEs: (i) sales of ATEs and ATE components to customers who only use one brand of ATEs; and (ii) sales of ATEs and ATE components to customers who, despite using more than one brand of ATEs in their

business, need to add additional capacity to use in manufacturing programs along with an existing stock of Teradyne ATEs (collectively, the "Locked-in Relevant Markets").

64.     Teradyne's monopoly power is indicated by its market share—Teradyne accounts for more than 70% of all ATEs sold to Teradyne customers.  Teradyne's share of sales of reconfigured Teradyne ATEs is already or soon will be more than 70%.  Teradyne's monopoly power is also evinced by its power to exclude BSE from the Locked-In Relevant Markets.

65.     There are significant and substantial barriers to any other company's ability to enter the relevant market and sell ATEs to Teradyne's locked-in customers.  These entry barriers include, but are not limited to, the following:

a.  the prohibitive cost of switching ATE brands, as described in Paragraph 50, *supra.*

b.  acquiring the education, skill and experience to design, reconfigure, construct, market, and sell reconfigured Teradyne ATEs;

c.  attracting from a limited population of trained professionals (often current and former Teradyne employees) the workforce with the requisite skills and experience to design, reconfigure, construct, market, and sell reconfigured Teradyne ATEs;

d.  substantial financial capital investment to purchase or lease a facility with "clean room" machinery to provide the environment required to reconfigure these ATEs;

e.  sufficient global presence to provide on-site installation and troubleshooting services;

    f.   substantial financial capital to acquire an ample inventory of spare components needed for reconfiguration;

    g.   an ability to obtain the necessary components in the future from Teradyne; and

    h.   the demonstrated ability to provide repair services for Teradyne Legacy Models and Current Models.

66.    Once a Chip Manufacturer has elected to purchase a particular brand of ATE, that customer will need to (i) add additional ATEs to increase program capacity; (ii) find alternative uses for ATEs that are no longer needed for the program, either because of decreased demand or the end of the program altogether; and, (iii) buy additional ATEs for new programs. Historically, the ATE industry has supported a primary third-party provider of reconfigured ATEs for each ATE manufacturer (e.g., BSE for Teradyne).  Customers, in making their lifecycle pricing calculations, rely on such third-party sources of reconfigured ATEs to provide competition for the ATE manufacturer.

67.    Because the average chip manufacturing program will consume at most only 20% of the useful life of an ATE, Chip Manufacturers need to be able to upgrade or reconfigure their fleet of ATEs for other programs or otherwise sell their used ATEs for use in another Chip Manufacturer's program.  Teradyne customers also need a cost-effective way of adding additional capacity to their programs on short notice through the purchase of new or reconfigured Teradyne ATEs.

68.    Most Teradyne customers, for the reasons set forth at Paragraphs 48 to 62, *supra*, are locked into buying additional Teradyne ATEs.  These customers have only one alternative to purchasing new ATEs from Teradyne, that is, to purchase a reconfigured Teradyne ATE.

69.     Reconfiguration, among other things, includes (i) configuring a used ATE to a Chip Manufacturer's exact specifications by replacing or supplementing the host computer and instrument boards as needed; (ii) removing any superfluous components; (iii) upgrading any instrument boards to higher functionality levels using Encryption Keys; (iv) replacing any worn, old, or otherwise suspect components; (v) thoroughly washing and cleaning the entire system; and (vi) testing and troubleshooting the final assembly.  If customers do not need to add additional capacity, they can also, as detailed at Paragraph 95, *infra*, "reconfigure" their ATEs by purchasing new components, albeit at a higher cost, from Teradyne to achieve the same end.

70.     Teradyne ATEs must be reconfigured using Teradyne components. Competing manufacturers' components are not compatible or interchangeable with Teradyne's. Teradyne is the only source of the components necessary to upgrade or reconfigure a Teradyne ATE.

71.     Reconfigured ATEs typically sell for $200,000 to $1.1 million, roughly 40% to 60% less than a new ATE of the same model and configuration.

72.     Locked-in customers lack the ability to retaliate against Teradyne by switching brands of ATEs.  Setting aside the prohibitive cost of switching brands as discussed at Paragraph 50, *supra*, the market for new ATEs does not operate competitively.  Reduced to a functional duopoly through years of market consolidation, mergers and acquisitions, Teradyne does not fear that its exploited customers will switch to Advantest in any material numbers sufficient to offset the monopoly profits Teradyne earns as a result of its anticompetitive activities.  Indeed, Teradyne management has often specifically reminded its sales force that its customers have "no alternative" to dealing with Teradyne in many areas.  Even those few customers who have explored

switching to Advantest have told BSE that Advantest has the same or similar objectionable policies to Teradyne's.

73.     Teradyne's locked-in customers have no viable options to purchasing ATEs other than from Teradyne and, before the Lockout, from BSE.  Although used ATEs may be sourced from brokers and other third parties, none of these brokers or third parties operates globally, provides ATEs that are specifically configured for the customer's program, provides installation and/or troubleshooting services, or sells their ATEs under warranty.  Only BSE and Teradyne qualify under each of these criteria.  Accordingly, the "as-is" used ATEs sold by brokers and other third parties do not compete in the relevant market with Teradyne and BSE.  In fact, these brokers and third parties sell the vast majority of their used ATEs to BSE and Teradyne, who, in turn, reconfigure these used ATEs for resale.

74.     Because of Teradyne's dominance in the relevant markets, its customers have been severely harmed by the Lockout, which materially and significantly changes the market structure and conditions of competition that customers specifically factored into their life-cycle pricing when they originally decided to purchase ATEs from Teradyne.

### The Service Market

75.     Chip Manufacturers require a range of repair services from their ATE providers.  For example, instrument boards fail from time to time and need to be repaired.  BSE sources replacement parts for instrument boards for Legacy Models on the open market.  Most of these parts are commodity-type items, even though the instrument boards themselves can only be manufactured by and sourced from Teradyne.

76.     Chip Manufacturers also often require a dedicated engineer on their factory floor who can troubleshoot ATE failures, run diagnostics, and service the machine on-site if

possible.  Such on-site maintenance support services are generally offered by Teradyne and BSE in conjunction with board repair services.

77.     Teradyne remains a monopolist in the Service Market, with a present-day market share of approximately 95%.  Following the expiry of the one-year warranty that comes bundled with purchases of most new Teradyne ATEs, Teradyne will offer repair contracts to its customers.  Teradyne service contracts are annual and apply to all Teradyne ATEs of the same model that are owned by the customer.  If a customer owns more than one model of Teradyne ATEs, Teradyne will sell separate contracts to that customer for each different model of ATE that it owns.  At all times prior to 2009, reconfigured Teradyne ATEs purchased from BSE were included as a matter of course under the customer's existing Teradyne service contract.

78.     Agreeing to Teradyne's annual service contracts has historically been the only way for customers to secure repair services for their ATEs, particularly for Current Models.  Teradyne does not offer transactional pricing and will not repair instrument boards on a board-by-board basis.  There are a handful of small regional independent service providers that repair Legacy Model instrument boards on a transactional basis, but none of these providers have the scale and scope required to provide the full range of repair services (especially on-site maintenance support services) required by Chip Manufacturers.

79.     As noted above, Teradyne has repeatedly exploited its monopoly power in the Service Market by arbitrarily ending repair support for Legacy Models well before the end of their useful lives.  These Legacy Models may last for at least an additional five years, if not a decade or longer, past Teradyne's notice of the end of formal support.  Typically, Teradyne will give its customers approximately eighteen months to two years' notice of its intention to stop formally supporting a Legacy Model, so as to allow affected customers to plan accordingly.

80.     While some Chip Manufacturers that own unsupported Legacy Models have used third-party repair shops to supplement in-house repair capabilities, most Chip Manufacturers have historically been forced to replace their Legacy Models with Current Models.

81.     BSE entered this segment of the Service Market—the servicing of Legacy Models—in 2009 both because BSE thought it was a viable business opportunity and in response to Teradyne's efforts to abuse its monopoly in repair services to exclude BSE from selling reconfigured ATEs to its customers.

82.     BSE's global footprint, highly trained engineers, reputation for quality, and its status as a once-certified reseller of Teradyne ATEs enabled BSE to provide more comprehensive service offerings.  BSE therefore became a threat to Teradyne's exploitative scheme to force its customers to purchase new ATEs long before their customers' existing ATEs had reached the end of their useful lives.

83.     Teradyne cannot retaliate against independent regional board repair servicers, which do not need to purchase parts from Teradyne to repair Legacy Models.

84.     Teradyne responded to BSE's competition for repair services in completely separate markets, the Locked-In Relevant Markets, where BSE and Teradyne had been cooperating profitably for more than a decade.

**BSE'S HISTORICAL COOPERATIVE RELATIONSHIP WITH TERADYNE**

85.     BSE's predecessor entity, Test Advantage, Inc., was formed in 1997 to satisfy customer demand for reconfigured Teradyne ATEs.  By reconfiguring and repairing Teradyne ATEs, BSE's customers are able to use their ATEs efficiently on multiple successive programs, fully utilizing each of their ATEs' useful life.  Where a customer finds a particular ATE surplus to requirements, BSE will purchase that ATE and either reconfigure it for another customer or otherwise harvest the ATE for its constituent components.  Finally, where a

customer needs to purchase additional capacity for an existing program, BSE can supply that customer with a reconfigured Teradyne ATE in the exact configuration needed to provide for seamless integration into that customer's program.  BSE also provides its reconfiguration customers with installation services and a 30-day warranty.

86.     BSE's ability to reconfigure Teradyne ATEs is entirely dependent on its ability to source components directly from Teradyne.  At all relevant times, Teradyne has freely offered these components for sale to the public, including to BSE.  Until the present dispute between BSE and Teradyne arose, Teradyne routinely sold new and upgraded components to BSE. Indeed, over the course of the last fifteen years, BSE has purchased millions of dollars of components from Teradyne.  In 2011 alone, BSE purchased at least $5 million of components from Teradyne.

87.     Throughout the last fifteen years, BSE has purchased what it needed from Teradyne without restraint or restriction, regardless of whether such purchases included (i) new, patented or copyrighted, or patent-pending or copyright-pending components; (ii) components designed by or for Teradyne; or (iii) components not subject to any claim of intellectual property.

88.     Teradyne continues to offer these same components for sale to the public today, excluding only BSE.  BSE cannot develop alternative components for those manufactured and sold by Teradyne.  Teradyne ATEs cannot be reconfigured with non-Teradyne components.

89.     Teradyne has profited from its sales of components to BSE, and would continue to do so absent the anticompetitive scheme outlined herein.  Indeed, unlike most other purchasers, BSE paid the full new list price for the components it purchased from Teradyne. Teradyne earned a profit margin on its sales to BSE of between 50% and 100%.

90.     On or about April 3, 2008, Teradyne announced the creation of a certified reseller program, the purpose of which was to provide its customers with a "reliable" third-party source for Teradyne ATEs, thereby enabling such customers to "add capacity with equipment that is consistent with Teradyne quality standards."  BSE had, as noted above, provided this capability with the longstanding cooperation of Teradyne for a decade prior to the creation of the Certification Program.

91.     BSE became a certified Teradyne reseller in or about May 2008.  By doing so, Teradyne certified that BSE's reconfigured Teradyne ATEs met "rigorous reconfiguration, test and ship processes."

92.     As part of the Certification Program, BSE was authorized to sell, along with reconfigured Teradyne ATEs, Teradyne service warranties.

93.     At the time, Jim Mahon, General Manager of Teradyne Global Customer Services, stated: "Customers use Teradyne legacy test equipment long after the initial purchase, and this program provides a reliable source to meet their capacity demands with a solution that Teradyne can confidently stand behind. . . . The tester certification program creates another way for us to support the needs of our customers while ensuring the quality that customers count on from Teradyne."

## TERADYNE'S WRONGFUL CONDUCT

### Teradyne Leverages Its Monopoly Position in the Service Market to Exclude BSE from the Locked-In Relevant Markets

94.     Prior to approximately 2009, Teradyne focused entirely on sales of new ATEs and new components.  Before that time, Teradyne had not operated a reconfiguration division, and had not devoted any material or significant assets, plants or personnel to reconfiguring ATEs.

95.     Instead of providing a true reconfiguration service for its customers, Teradyne sold to its customers the new components, including instrument boards and Encryption Keys, that the customers needed to test a different chip.  In contrast to a true reconfiguration service like BSE's, Teradyne did not buy back any used instrument boards or unnecessary Encryption Keys, leaving the customer with unwanted components.  By comparison, BSE offers customers a true reconfiguration service, which offsets the cost of adding instrument boards and Encryption Keys against the value of instrument boards and Encryption Keys that BSE removes from the ATE and retains for its own inventory.

96.     In or about 2009, Teradyne made the strategic decision to begin selling reconfigured ATEs.  Teradyne created an ATE reconfiguration division, to which it devoted significant assets, plant space, and manpower.  At the same time, Teradyne abruptly terminated its Certification Program.  In its November 13, 2009 termination notice, Teradyne claimed that it was discontinuing the Certification Program because of "soft market" conditions and "[l]imited success in driving the program to the desired business levels."

97.     Teradyne also stated in its November 13, 2009 notice that "Teradyne would like to continue to work closely with [BSE] in other areas of the business that we have been successful in partnering in" and that "Teradyne will also continue to foster new areas of opportunity which require assistance and expertise from an outside organization such as yours."  Teradyne, however, never identified any "other areas of the business" or "new areas of opportunity" in which to partner with BSE.  Instead, Teradyne's focus in the months and years since November 2009 has been the complete exclusion of BSE from the relevant markets.

98.     Following its entry into reconfigured ATE sales, Teradyne chose not to compete with BSE on price.  Indeed, Teradyne continued to seek to charge customers substantially more for the same reconfigured ATE product than BSE, often as much as 40% above BSE's price.

99.     Rather than competing on price with BSE, Teradyne sought anticompetitively to exclude BSE from the market.  Teradyne has employed numerous illegal strategies in its efforts to exclude BSE.

100.    For example, Teradyne has elicited exclusionary contracts from its customers that prevent BSE from competing with Teradyne for sales to those customers.  According to customers, these contracts (i) condition the customer's ability to purchase the most recent Teradyne ATEs on their agreement not to deal with BSE for reconfigured ATEs; (ii) assess financial penalties for sourcing reconfigured ATEs from BSE; and, (iii) revoke all service and support if customers contract with BSE for repair services.

101.    Teradyne has also sought to leverage its monopoly position in the Service Market to force its customers to deal exclusively with Teradyne for both reconfigured ATE purchases and repair services.  Prior to approximately 2009, Teradyne regularly included BSE-reconfigured ATEs in Teradyne service contracts in the normal course of business.  Furthermore, as part of the Teradyne Certification Program, Teradyne permitted BSE to bundle Teradyne service offerings into orders and to sell those services to customers.  Indeed, prior to approximately 2009, Teradyne had never charged its customers for inspecting a reconfigured ATE purchased from BSE.  Once Teradyne began competing with BSE for these sales, however, that policy changed.  Specifically, Teradyne announced a policy that all reconfigured ATEs purchased from any third party would need to be inspected at a significant and undetermined cost.

102.    Teradyne's new "inspection" policy was nothing more than an anticompetitive pretext to price BSE, the only significant third-party competitor to Teradyne, out of the market.  Because BSE provides a 30-day warranty, including installation and troubleshooting services, for each ATE it sells, Teradyne's "inspection" requirement is thus unnecessary or otherwise duplicative of work already undertaken or warranted by BSE.  Indeed, BSE is unaware of any instance, prior to 2009 or since that time, where a reconfigured ATE it sold required more than typical troubleshooting, which would not have necessitated such an inspection.

103.    On its website, Teradyne continues to threaten its customers that:

> *"When considering a purchase from a [third party] there are hidden costs which can impact the total financial investment in the system.  In order for Teradyne to service or support a system it must be inspected in order by a qualified Teradyne service engineer and the licensing needs to be purchased for all required features on the system. Any problems must be resolved and any necessary repairs must be completed prior to the system being eligible for a service contract.  A software and service fee (including time, travel, and materials) is charged by our service organization for this inspection."*

Teradyne, Inc., <u>Factory Reconditioned Systems</u>, Teradyne.com, http://www.teradyne.com/factory (last visited May 16, 2013) (emphasis added).

104.    This new "inspection" policy was merely a pretext for Teradyne's true objective, namely, restraining BSE's ability to compete with Teradyne for sales of ATEs to its customers by driving up BSE's costs.  Indeed, and despite its customers' requests, Teradyne has steadfastly refused to specify any criteria for its "inspection," thereby preventing anyone from being able to calculate the cost of such an inspection.  With such a vaguely worded policy, Teradyne threatened to drive up the cost of providing a reconfigured ATE before agreeing to include any ATE purchased from BSE under its service contract.

105.     In promulgating this policy, which represented a departure from past practices, Teradyne understood that its customers were unlikely to purchase ATEs that Teradyne would not repair.  Because of its monopoly position in repair services, Teradyne understood that its customers had to ensure that any reconfigured ATEs they bought would be included under their existing Teradyne service contracts.  Accordingly, Teradyne customers now had to factor in the undetermined costs of complying with this vague policy when considering whether to purchase a reconfigured ATE from BSE.

106.     Teradyne's "inspection" requirement directly caused some customers to refuse to consider purchasing reconfigured ATEs from BSE.

107.     BSE took measures to enable itself to continue to compete with Teradyne, despite the imposition of the "inspection" requirement.  In approximately 2009, BSE had begun to develop in-house repair capabilities.  In response to Teradyne's threatened inspections, BSE began offering its customers up to a two-year warranty on all of its sales of reconfigured ATEs.

108.     Just as Teradyne had previously refused to compete with BSE on price for reconfigured ATEs, Teradyne now refused to compete with BSE on service.  Instead of competing on the merits, Teradyne publicly defamed BSE's service capabilities, telling customers that BSE's engineers were not qualified to repair Teradyne ATEs.

109.     Teradyne's statements about BSE's capabilities were meritless.  In fact, among other things, Teradyne previously certified BSE in 2008 as a "reliable source."  BSE also currently employs many qualified former Teradyne engineers.

110.     Teradyne's meritless statements concerning BSE's qualifications to repair Teradyne ATEs directly caused some customers to refuse to consider purchasing reconfigured ATEs and/or service offerings from BSE.

111.    Some customers, however, refused to be cowed by Teradyne's threats and false insinuations about BSE's capabilities.  These customers, having considered and reviewed BSE's qualifications, informed Teradyne that they intended to (i) purchase reconfigured ATEs from BSE; and (ii) contract with BSE for repair services for those ATEs.

112.    Teradyne responded in two ways to these customers.  With some customers, Teradyne waived its "inspection" requirement and agreed to service reconfigured ATEs purchased from BSE under the customers' Teradyne service contract, albeit at a much higher price than the cost of servicing reconfigured ATEs purchased from Teradyne.[8]  For other customers, Teradyne took a much stricter approach, threatening to cut off all repair services to those customers, including repair services for Current Models.  Because BSE lacked the ability to service Current Models, these customers had no choice but to cancel their orders with BSE and purchase new or reconfigured ATEs from Teradyne.

113.    Teradyne's arbitrary waiving of the "inspection" requirement to some customers on the one hand, and Teradyne's retaliatory threat to cut off service for Current Models on the other, demonstrates that each of Teradyne's prior actions was nothing more than a pretext to anticompetitively exclude BSE from selling reconfigured ATEs to its customers.

114.    Teradyne also threatened to deny customers access to its state-of-the-art technology, or otherwise to assess a punitive fee on them, if they dealt with BSE for supply of reconfigured ATEs or for repair services.  In many recent cases, Teradyne's contracts with its customers contained exclusionary language to this effect.

---

[8]    Customers have also reported that Advantest now has a similar policy to Teradyne's.

*Teradyne's Retaliatory Lockout*

115.     Between approximately August 2011 and February 2012, BSE competed with Teradyne for an annual repair contract with Freescale Semiconductor ("Freescale"), a U.S. company, to repair its Legacy Model ATEs.  This contract was worth more than $900,000 annually.

116.     In or about 2011, Teradyne notified Freescale that it intended to cease formal support services for the J973 ATE system in 2013.  Freescale had a significant investment in its J973 systems and did not want to replace them with new model ATEs.  Indeed, the J973 system still had many years of useful life remaining and Freescale had planned to exhaust that useful life entirely when it originally made the decision to purchase its J973 systems from Teradyne. Recognizing that Teradyne might end support for that model before the end of its useful life, at the time of its purchase decision, Freescale relied on the availability of third-party service providers for Legacy Models.

117.     Accordingly, following receipt of Teradyne's notice that it would cease supporting the J973 system, Freescale sought to replace Teradyne with a third-party service provider that was committed to supporting the J973 system in the future.  To ensure a smooth transition without service interruptions (which would be catastrophic for Freescale's business), Freescale sought to qualify its new third-party service provider in the months leading up to Teradyne's announced end-of-support date.

118.     In or about February 2012, Freescale notified BSE that it had been awarded the service contract for the final year of Teradyne's official support and would be Freescale's service provider for J973 systems going forward.  Freescale told BSE at the time that it had won the contract based on technical merit, responsiveness and price.

119.     In or about February 2012, Freescale also notified Teradyne of its decision to award the service contract for the J973 system to BSE.  Teradyne demanded that Freescale

reconsider its decision.  It threatened Freescale that if it contracted with BSE to service its J973 systems, Teradyne would withhold support for all of Freescale's other Teradyne models.  In addition to the 56 J973 systems that it owned, Freescale also owned hundreds of Current Model ATEs for which it relied entirely on Teradyne for service.

120.    Teradyne's threat to condition its provision of service contracts for Freescale's Current Models on Freescale's agreement not to contract with BSE for service of its J973 systems proved an effective deterrent to BSE's ability to compete.  Freescale's business requires it to deliver the correct number of chips, at the correct design and functionality, on the exact date of delivery specified at the start of production.  Any delays or errors could prove fatal to Freescale's future ability to compete with other Chip Manufacturers.  Accordingly, despite the higher cost of dealing exclusively with Teradyne, including the likelihood of a required replacement of its J973 systems with new Teradyne models, Freescale was forced to abandon its efforts to award this contract to BSE.

121.    On or about March 7, 2012, Freescale accordingly notified BSE that because Teradyne had threatened to put its operations and quality control at risk by withholding support on its Current Models, Freescale had no choice but to award the contract for the J973 system to Teradyne.

122.    Freescale was forced to award the service contract for the J973 systems to Teradyne despite Teradyne's continued intention to cease servicing the J973 system during 2013. Teradyne has offered no assurances that it would make any support available to Freescale after that point.

123.    Thus, Freescale will likely have to abandon its J973 systems before the end of their useful lives and replace them with new ATEs.  Given Freescale's significant investment in,

among other things, the training and qualifying its engineers on Teradyne ATEs, its investment in

Teradyne components, and its total reliance on Teradyne to service its Current Models, Freescale is

locked into purchasing new ATEs from Teradyne.

124.    Notwithstanding its successful efforts to preclude BSE from competing on

the merits for the Freescale contract, and although the Freescale contract was for repair services and

not the sale of reconfigured ATEs, Teradyne sales representatives told BSE in or about early April

2012 that it was considering denying BSE access to the components it needed to reconfigure ATEs.

125.    Subsequently, Teradyne, through its General Counsel, represented to BSE

that no one had been denied access and that there were no instructions to anyone at Teradyne not to

talk with BSE.

126.    On or about May 2, 2012, BSE executives met with Teradyne management

in Boston.  BSE explained that it had developed its repair service business in reliance on Teradyne's

historical tolerance of third parties that serviced unsupported Legacy Models.  Teradyne did not

deny that it had been abandoning its Legacy Models for years, but stated that it now considered

Legacy Models to be "strategic" and that BSE had "no business being in there."  BSE told Teradyne

that it wished to move forward, continuing their past history of profitable collaboration.  Teradyne

agreed, stating that it would henceforth consider all purchase orders from BSE "on a case by case

basis."

127.    For the balance of 2012, unlike today, Teradyne approved each and every

purchase order submitted by BSE.

128.    On or about July 13, 2012, Teradyne wrote to BSE, stating that it was

willing to move forward with BSE on two conditions: (i) that BSE abandon its repair services

business and (ii) that BSE get Teradyne's approval for each and every sale of a reconfigured ATE in advance of making the sale.

129.    On or about August 10, 2012, BSE responded, stating that, in response to Teradyne's complaints and actions, BSE would explore divesting its repair service business.  BSE further stated that while it was willing to partner with Teradyne in reconfiguration sales, it was prepared to do so only on terms other than the blatantly anticompetitive conditions that Teradyne had suggested.  Instead, BSE offered to partner with Teradyne so that each company could help mutual customers where the other company did not have the inventory or expertise to do so.

130.    BSE accordingly sought to partner with Teradyne where BSE could do so on reasonable and appropriate terms.

131.    For example, in or around 2011, BSE and Teradyne's Japanese sales office had begun exploring whether the two companies could work together to better serve Teradyne's Japanese customers.  Specifically, Teradyne needed a solution for service and support of Legacy Models for its Japanese customers who, for uniquely cultural as well as for more common business reasons, insisted on having capable solutions for their technical needs once Teradyne ended support. Although these customers had no viable alternatives to dealing with Teradyne for new ATEs, Teradyne Japan had for years been tacitly approving its customers' use of local third-party service providers for service of Legacy Models.  Teradyne Japan told BSE that it would be more comfortable with its customers' using BSE as a source for Legacy Model repair service, given BSE's high quality and competence.

132.    In or about spring 2012, Teradyne announced that it intended to end support services for its A56X ATE system in March 2014.  One Japanese customer, J-Devices, owned approximately 220 units of the A56X model, and depended heavily on this model.  The cost of

replacing its existing fleet of A56X ATEs with new ATEs could have easily exceeded $100 million, which was a prohibitive expense for a company that generated approximately $450 million of annual revenue in 2012.

133.    After Teradyne's announcement, J-Devices approached BSE and asked that it consider bidding to become J-Devices' primary service provider after March 2014.  BSE informed Teradyne that it was considering bidding for the J-Devices contract and Teradyne encouraged BSE to do so.  BSE began negotiating with J-Devices during the summer of 2012.

134.    Soon thereafter, J-Devices informed BSE and Teradyne that it had determined that switching service providers all at once in March 2014 would pose too great a risk to its business.  Accordingly, J-Devices proposed to split the upcoming 2013 service contract between two companies, before turning over the entire 2014 contract to the third-party provider.  This would allow a period of overlap during which the transition from manufacturer service to third-party service could proceed with less risk to J-Devices.

135.    As late as approximately October 25, 2012, BSE and Teradyne were actively and positively discussing J-Devices' proposal to split the 2013 service contract between two companies.

136.    In or around October or November 2012, J-Devices informed the parties that it intended to split the 2013 service contract 60% to Teradyne and 40% to BSE.  Initially, Teradyne Japan responded positively to the proposed split.

137.    In or about late November 2012, however, Teradyne abruptly reversed its attitude to the allocation of the 2013 J-Devices service contract.  Despite the efforts of Teradyne Japan to allow its customers to have access to needed service, Teradyne's Corporate Headquarters prioritized its anticompetitive scheme to exclude BSE from the market over the natural profit-

seeking objectives of its business model.  On or about November 27, 2012, fearing how the award of 40% of the J-Devices contract to BSE would be viewed by Teradyne Corporate Headquarters, Teradyne Japan wrote to BSE demanding that BSE withdraw its bid, and threatened that there would be retaliation against BSE from Teradyne Corporate Headquarters in Boston if it failed to do so.

138.    In response, BSE rejected Teradyne's unlawful demand.

139.    Having worked with and submitted a bid to a customer in good faith, BSE was also concerned that its reputation would be severely damaged if it withdrew its bid at such a late date.  Indeed, J-Devices strongly requested that BSE not withdraw its bid, as it needed to secure a long-term service provider to support its fleet of ATE systems after Teradyne ceased formal support in March 2014.

140.    Despite similar pleas to Teradyne, Teradyne refused to commit in writing to supporting J-Devices' ATEs after that date.  Teradyne instead told J-Devices that it "would do what it could" about providing some limited services to J-Devices after March 2014, but could not guarantee that such services would be comprehensive or lasting.  Told that BSE was offering comprehensive support, Teradyne responded by telling J-Devices that BSE was not qualified to service J-Devices' A56X ATEs.

141.    In or about early January 2013, J-Devices awarded the 2013 service contract to both Teradyne and BSE, 60% and 40% respectively, as planned.  The value of the partial contract won by BSE was $420,000.  Reflecting its higher prices, Teradyne claimed that the award of a contract based on BSE's lower bid had cost it $600,000 in sales revenues.

142.    Teradyne quickly made good on its threats to retaliate.  Within 48 hours of learning of the J-Devices outcome, on January 16, 2013, Teradyne sent a letter to BSE notifying it

that Teradyne had officially "decided to discontinue business" with BSE and its affiliated

companies (January 16th letter attached hereto as **Exhibit B**).

143.    Since receiving the January 16th letter, BSE has repeatedly requested an

opportunity to discuss Teradyne's decision to discontinue what had been a profitable fifteen-year

history of cooperative relations between the two companies.  Teradyne has, to date, steadfastly

refused any discussion, stating only that it would not deal with BSE so long as BSE "continues to

choose to operate as a direct competitor to Teradyne in the service space."  Teradyne has

conveniently overlooked its anticompetitive threat to discontinue repair services for customers who

dealt with BSE for purchases of reconfigured ATEs, which had caused BSE to enter the Service

Market in the first place.  Teradyne's purported justification for its refusal to deal is nothing more

than an anticompetitive scheme calculated to exclude BSE from the relevant markets and drive up

the cost of reconfigured ATEs to Teradyne's locked-in customers.

144.    Within days of the January 16, 2013 letter, Teradyne sales personnel began

to inform its customers that BSE would no longer be able to source components from Teradyne.

Indeed, Teradyne has rejected all of BSE's continuing efforts to purchase Teradyne components,

despite the fact that BSE (unlike most of Teradyne's customers) always pays the full new list price.

Teradyne has rejected each and every purchase order submitted by BSE since January 16, 2013.

145.    In or about late February 2013, Teradyne published the Lockout Notice

(**Exhibit A**) in its newsletter, which was distributed by Teradyne both internally and externally.

146.    The Lockout Notice, which bears the heading "Teradyne Severs Ties with

Test Advantage, Microstats, BSE," states:

> **STOP.  Do not sell testers, parts or services to Test Advantage,**
> **Microstats or BSE!  In light of the recent business activities of**
> **the BSE Group, we have decided to discontinue all business with**

**the BSE Group, LLC (parent company of Test Advantage and Microstats).**

**Please help enforce this policy by declining any requests from BSE/ Test Advantage/ Microstats, including:**

- **Pricing**
- **Technical Information**
- **Technical Support**
- **Software Licenses & Upgrades**
- **Spares & Replacement Parts**

**As a practical matter, if a Test Advantage-owned system is being leased by one of our customers, we will continue to provide our full range of support services to the end customer.  This reflects our requirement that Tester Support Agreements must cover all systems of a common product family that are located at the same physical site.**

147.    Teradyne has widely distributed the Lockout Notice both internally and externally to customers and others in the chip manufacturing sector.

148.    Following distribution of the Lockout Notice, several of BSE's customers have questioned BSE's ability to provide them with reconfigured ATEs going forward.

149.    While competition from BSE had acted as a constraint on Teradyne's ability unilaterally to set pricing and discontinue offering reconfiguration services, following its Lockout of BSE, Teradyne now possesses or threatens soon to possess monopoly power in the Locked-In Relevant Markets.  BSE's efforts to compete with Teradyne have been quashed by Teradyne's denial of access to the required components, rendering BSE unable to perform reconfiguration services.  Aware of the uncertainty surrounding BSE's ability to obtain the required components, its customers are now ordering reconfigured and new ATEs from Teradyne, albeit at higher prices than those generally charged by BSE, in order to secure guaranteed on-time delivery and installation at their manufacturing facilities.

150.    Once it has driven BSE out of business, Teradyne will have little motivation to keep its reconfiguration business alive, opting instead to sell only new ATEs for a much higher price and profit margin to its locked-in customers.  Even if Teradyne were to retain its reconfiguration business, it would, absent competition from BSE, continue to sell those reconfigured ATEs at higher prices.

151.    Teradyne has also secured for itself a secondary monopoly.  Teradyne is now the only entity in the market to purchase used Teradyne ATEs from Chip Manufacturers.  Teradyne has created its own market price for the purchase of used ATEs because it is the only material buyer of these ATEs, as BSE no longer considers purchasing used ATEs a viable investment at this stage.  Accordingly, Teradyne may now unilaterally set for itself the used Teradyne ATE price, free from competitive bidding or other constraining market forces.

152.    As a result of Teradyne's refusal to deal with BSE, BSE is unable to (i) acquire the necessary components it needs to provide reconfigured ATEs for its current contracts; (ii) upgrade the various instrument boards it has in its inventory, despite the fact that Teradyne sold each of these boards with the promise that their owner, namely BSE, was entitled to purchase any and all upgrades for them; (iii) access the Teradyne SSL to move between ATEs Encryption Keys that either BSE or its customers own; and, (iv) compete for future reconfigured ATE sales business.

153.    As a direct result of Teradyne's anticompetitive Lockout, BSE has lost contracts worth millions of dollars through April 2013 alone.

154.    Currently, BSE has a substantial inventory of Teradyne instrument boards that, prior to January 2013, was worth more than $23 million.  As a result of Teradyne's Lockout, those instrument boards are now worth substantially less.

155.    Absent BSE's competition, Teradyne has now been able to sell its reconfigured ATEs at prices higher than the market prices that prevailed prior to the Lockout.

156.    Absent BSE's competition, Teradyne also now has monopsony power in the global market for purchasing used Teradyne ATE systems.  Prior to January 2013, competition between BSE and Teradyne for used Teradyne ATE systems produced market prices of approximately $500,000 per used ATE.  Since January 2013, used ATEs that BSE would have purchased remain on the market unsold, despite significant reductions in the offered selling prices.

157.    Teradyne's policy affects or will affect the markets and prices of nearly all consumer electronics products worldwide.  For purposes of demonstrating the breadth of this effect, consumers can be defined as any individual or entity purchasing, renting, leasing, or otherwise using any product containing a microchip or electronic processor of any kind.  Commonplace examples of these products include telephones, televisions, automobiles, computers, airplanes, programmable coffee machines, DVD players and recorders, radios, and virtually every other product using electronic circuitry.

## COUNT I

**(Monopolization, Attempted Monopolization and Conspiracy
to Monopolize in violation of the Sherman Act, 15 U.S.C. § 2)**

158.    BSE repeats and realleges the allegations contained in Paragraphs 1 through 157 as if fully set forth herein.

159.    BSE competes with Teradyne in the Locked-In Relevant Markets throughout the world.

160.    Teradyne possesses or has a dangerous probability of acquiring monopoly power in the Locked-In Relevant Markets.  For the reasons set forth at Paragraphs 48-62, *supra*,

Teradyne customers have no choice but to continue to purchase Teradyne ATEs and ATE components for at least a decade, if not longer.

161.     This claim arises under the Sherman Act, 15 U.S.C. § 2, and the Clayton Act, 15 U.S.C. §§ 15 and 26, and seeks a judgment that Teradyne has violated Section 2 of the Sherman Act by monopolizing, attempting to monopolize and conspiring to monopolize the Locked-In Relevant Markets.

162.     Through the foregoing acts, Teradyne, unlawfully and in violation of Section 2 of the Sherman Act, has used, is using, and if not restrained by this Court, will continue to use its power in the Locked-In Relevant Markets to monopolize, attempt to monopolize, and conspire to monopolize these markets.

163.     A monopolist's denial to competitors of access to its essential goods, services or resources has been held to violate Section 2 of the Sherman Act.  Since January 16, 2013, after more than fifteen years of cooperative and profitable dealings, Teradyne has knowingly and intentionally prohibited BSE from accessing the essential components needed to reconfigure Teradyne ATEs.  Teradyne, a monopolist, maintains exclusive control over the essential components required for BSE to compete in the Locked-In Relevant Markets.

164.     BSE cannot practically or reasonably duplicate these essential components for the purpose of reconfiguring Teradyne ATEs.  Nor can these essential components be obtained from another source.

165.     Because Teradyne has prevented BSE from accessing these necessary components using competition in the Service Market as a pretext, and despite BSE's offer to purchase these components (as it has for more than fifteen years) at full new list prices, Teradyne's

conduct demonstrates predatory intent, has the effect of excluding BSE as a competitor, and preserves Teradyne's dominant position.

166.    Providing these essential components to BSE would be feasible.  Teradyne could simply sell these essential components to BSE at or near the price it provides to other customers.  No ongoing supervision by the Court would be required to enforce such an order. Indeed, prior to January 16, 2013, BSE repeatedly purchased these components from Teradyne at full new list prices.

167.    The Lockout Notice (**Exhibit A**) demonstrates that Teradyne has acted with the specific purpose of excluding BSE and thereby monopolizing the Locked-In Relevant Markets.

168.    Chip Manufacturers that own Teradyne ATEs, for the reasons described herein, do not consider other brands of ATEs to be acceptable substitutes for a Teradyne ATE. Teradyne's anticompetitive policies and actions described above are designed to eliminate all competition in the sale of reconfigured ATEs to its customers, leaving Teradyne as the sole source of reconfigured ATEs, if it elects to continue selling them at all.

169.    The natural and foreseeable result of Teradyne's predatory and exclusionary conduct has been and will continue to be to deprive BSE of its ability to reconfigure Teradyne ATEs.  Teradyne has therefore, through predatory and exclusionary means including those described above, deliberately achieved, or has a dangerous probability of achieving, monopoly power in these markets.

170.    Teradyne's conduct has no pro-competitive purpose or legitimate business justification.  Teradyne's conduct can only be explained by anticompetitive motives, and a desire to foreclose competition in the Locked-In Relevant Markets.  Teradyne's purported justifications are pretextual.

171.     To the extent that Teradyne proffers any legitimate business justifications for its exclusionary conduct, Teradyne's conduct is more anticompetitive than necessary to serve those justifications.

172.     Barriers to entry into the business of reconfiguring Teradyne ATEs are substantial.  They include, but are not limited to, the following:

a.     Acquiring the education, skill and experience to design, reconfigure, construct, market, and sell reconfigured Teradyne ATEs;

b.     Attracting from a limited population of trained professionals (often current and former Teradyne employees) the workforce with the requisite skills and experience to design, reconfigure, construct, market, and sell reconfigured Teradyne ATEs;

c.     Substantial financial capital investment to purchase or lease a facility with "clean room" machinery to provide the environment required to reconfigure these ATEs;

d.     Sufficient global presence to provide on-site installation and troubleshooting services;

e.     Substantial financial capital to acquire an ample inventory of spare components needed for reconfiguration;

f.     An ability to obtain the necessary components in the future from Teradyne;

g.     The demonstrated ability to provide repair services for Teradyne Legacy Models and Current Models.

173.     Teradyne's conduct as alleged herein has significantly increased the barriers to entry into the business of reconfiguring Teradyne ATEs, thereby making it more likely that Teradyne will enjoy the ill-gotten fruits of its anticompetitive conduct free from the threat of new competition arising in the future.

174.     By its scheme, Teradyne intentionally and wrongfully acquired or has the dangerous probability of acquiring monopoly power in the Locked-In Relevant Markets.  As a direct and proximate result of Teradyne's unlawful acquisition or attempted acquisition of monopoly power, BSE has suffered and will continue to suffer injury to its business and property, including lost profits, out-of-pocket costs, lost business opportunities, and diminution in value of BSE's business enterprise, inventory, customer lists, goodwill and reputation.

175.     Teradyne's anticompetitive and predatory practices have harmed consumers and competition by preventing competition between BSE and Teradyne in the Locked-In Relevant Markets.

176.     Teradyne's anticompetitive and exclusionary conduct has directly and proximately caused injury to BSE's business and property, as set forth above.  BSE's injury is the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

177.     Teradyne's anticompetitive and predatory conduct, unless restrained, will continue.  Unless the activities complained of are enjoined, BSE will suffer immediate and irreparable injury for which BSE is without an adequate remedy at law.

178.     Teradyne's refusal to sell components to BSE "*even if compensated at retail price* reveal[s] a distinctly anticompetitive bent." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004) (emphasis in original).  As in *Trinko,* Teradyne has

"turned down a proposal to sell at its own retail price, suggesting a calculation that its future

monopoly retail price would be higher." *Id.*

179.    BSE is entitled to a judgment that Teradyne has violated Section 2 of the

Sherman Act; to the damages it suffered as a result of that violation, to be trebled in accordance

with the Clayton Act, 15 U.S.C. § 15, plus interest; to its costs and attorneys' fees; and to an

injunction against Teradyne, preventing and restraining the violations alleged herein.

## COUNT II

### (Tying in Violation of the Sherman Act, 15 U.S.C. §§ 1 and 2)

180.    BSE repeats and realleges the allegations contained in Paragraphs 1 through

179 as if fully set forth herein.

181.    This claim arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1

and 2, and the Clayton Act, 15 U.S.C. §§ 15 and 26, and seeks a judgment that Teradyne has

violated Sections 1 and 2 of the Sherman Act by illegally conditioning the purchase of repair

services contracts for Current Model ATEs on agreements to purchase reconfigured Teradyne ATEs

only from Teradyne.

182.    Teradyne entered into agreements in unreasonable restraint of trade in

violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, by tying its provision of

repair services to only those ATEs purchased directly from Teradyne.  Teradyne possesses

monopoly power in the Service Market.  Through the anticompetitive conduct alleged herein,

Teradyne has willfully maintained, and unless restrained by the Court will continue to willfully

maintain, that power by anticompetitive and unreasonably exclusionary conduct.

183.    Teradyne's agreements with its customers compel Chip Manufacturers to

purchase reconfigured Teradyne ATEs exclusively from Teradyne, and penalize customers that fail

to do so.  These agreements unreasonably restrain trade and restrict the access of Teradyne's only

material competitor, namely BSE, to compete—on the basis of price and/or quality—for these customers' business, thereby restraining competition in the Locked-In Relevant Markets.

184.    The purpose and effect of these agreements is to restrain trade and competition in the Locked-In Relevant Markets.  These agreements violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

185.    Another purpose and effect of these agreements is unlawfully to maintain Teradyne's monopoly position in the Service Market.  These agreements therefore also violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

186.    Teradyne's conduct constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.  Alternatively, any pro-competitive benefits, if they exist, associated with Teradyne's conduct do not outweigh its actual and likely anticompetitive effects.

187.    The Locked-In Relevant Markets and the Service Market are separate and distinct relevant antitrust markets.  That is, there are separate degrees of supply and demand for each of these products and services.

188.    The purpose and effect of Teradyne's impermissible tying of these two markets is to prevent customers from choosing to purchase reconfigured Teradyne ATEs from BSE on the merits and to foreclose BSE from its customers, thereby restraining competition.

189.    As a proximate result of Teradyne's unlawful conduct, BSE has suffered injury to its business and property, including lost profits, out-of-pocket costs, lost business opportunities, and diminution in value of BSE's business enterprise, inventory, customer lists, goodwill and reputation.

190.    Teradyne's anticompetitive and predatory practices have harmed consumers and competition, by preventing competition between BSE and Teradyne in the Locked-In Relevant Markets.

191.    Teradyne's anticompetitive and exclusionary conduct has directly and proximately caused injury to BSE's business and property, as set forth above.  BSE's injury is the type the antitrust laws are intended to prevent and thus constitute antitrust injury.

192.    Teradyne's anticompetitive and predatory conduct, unless restrained, will continue.  Unless the activities complained of are enjoined, BSE will suffer immediate and irreparable injury for which BSE is without an adequate remedy at law.

193.    BSE is entitled to a judgment that Teradyne has violated Sections 1 and 2 of the Sherman Act; to the damages it suffered as a result of that violation, to be trebled in accordance with the Clayton Act, 15 U.S.C. § 15, plus interest; to its costs and attorneys' fees; and to an injunction against Teradyne, preventing and restraining the violations alleged herein.

## COUNT III

### (Exclusive Dealing in Violation of the Sherman Act, 15 U.S.C. § 1)

194.    BSE incorporates by reference each of the allegations contained in Paragraphs 1 through 193 above as if fully set forth herein.

195.    This claim arises under the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. §§ 15 and 26, and seeks a judgment that Teradyne has violated Section 1 of the Sherman Act by conspiring, combining and/or agreeing to restrain trade in the Locked-In Relevant Markets and the Service Market.

196.    The foreclosure of markets through exclusive dealing contracts can violate Section 1 of the Sherman Act.

197.    Through the foregoing acts, Teradyne, unlawfully and in violation of Section 1 of the Sherman Act, has acted pursuant to a contract, combination or conspiracy for the purpose, and with the likely effect, of unreasonably restraining trade in the Locked-In Relevant Markets and the Service Market.

198.    Specifically, Teradyne has entered into unlawful agreements with various Chip Manufacturers that, among other things:

      a.    Restrict customers' access to Teradyne's state-of-the-art technology if the customers purchase reconfigured ATEs from third parties;

      b.    Impose punitive fees on customers who purchase reconfigured ATEs from third parties; and

      c.    Condition Teradyne's provision of repair services for Current Models on its customers' agreement not to contract with third parties for repair of Legacy Models.

199.    Teradyne uses these and similar agreements to exercise complete control over sales of ATEs and repair services to its customers.

200.    Through its illegal agreements, Teradyne is able effectively to foreclose all competitors from supplying its customers with ATEs and repair services.

201.    Each of these agreements constitutes a contract, combination and conspiracy that substantially, unreasonably and unduly restrains trade in the Locked-In Relevant Markets and the Service Market and harmed BSE thereby.

202.    There is no legitimate, pro-competitive business justification for Teradyne's agreements with its customers that outweighs the anticompetitive effect of these

agreements.  Teradyne's purported justifications are pretextual.  Even if there was some business justification, the agreements are broader than necessary to achieve such a purpose.

203.    The foregoing acts have harmed consumers and competition.

204.    As a result of Teradyne's conduct, BSE has suffered and will continue to suffer injury to its business and property, including lost profits, out of pocket expenses, loss business opportunities and diminution in value of BSE's business enterprise, inventory, customer lists, goodwill and reputation.

205.    Teradyne's anticompetitive and exclusionary conduct has directly and proximately caused injury to BSE's business and property, as set forth above.  BSE's injury is the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

206.    Teradyne's anticompetitive conduct, unless restrained, will continue to cause injury to BSE's business and property, as set forth above.  Unless the activities complained of are enjoined, BSE will suffer immediate and irreparable injury for which BSE is without an adequate remedy at law.

207.    BSE is entitled to a judgment that Teradyne has violated Section 1 of the Sherman Act; to the damages it suffered as a result of that violation, to be trebled in accordance with the Clayton Act, 15 U.S.C. § 15, plus interest; to its costs and attorneys' fees; and to an injunction against Teradyne, preventing and restraining the violations alleged herein.

## COUNT IV

### (Tortious Interference with Prospective Business Relationships)

208.    BSE repeats and realleges the allegations contained in Paragraphs 1 through 207 above as if fully set forth herein.

209.    This claim arises under Massachusetts law and seeks a judgment that Teradyne has tortiously interfered with BSE's prospective business relationships.

210.    At all relevant times, BSE had legitimate expectations of contractual relationships with third parties.

211.    At the time of its January 16, 2013 Lockout, Teradyne was aware or should have been aware that BSE was a party to, in the process of entering into, and eventually would have entered into, various business relationships with Teradyne customers for the future sales of reconfigured ATEs and for the repair of Teradyne ATEs.  Because the very nature of BSE's business is the generation of future reconfiguration and service contracts, Teradyne was aware of the probability that BSE had business relationships that had not yet been reduced to contracts and also had continuing business relationships that were not formalized by a single written contract. Teradyne has also become aware of these prospective contracts through BSE's requests for quotes and attempts to place purchase orders on behalf of customers.

212.    Despite actual and constructive knowledge of these business relationships, Teradyne intentionally decided not to sell BSE the components BSE needed to reconfigure ATEs for its customers.  Teradyne also intentionally decided to condition essential services from Teradyne on its customers' agreement not to deal with BSE for repair services.  Teradyne knows that BSE relies on the availability of Teradyne components in contracting with its customers.  Moreover, Teradyne has shown the Lockout Notice to BSE's prospective customers as proof that BSE cannot compete for their business.

213.    As detailed at Paragraphs 115 to 123, *supra*, Teradyne intentionally interfered with BSE's negotiations with, among other customers, Freescale.  Indeed, although Freescale had told BSE that it had won its service contract, worth $900,000 annually, before the parties could execute that contract, Teradyne's threat to withhold services for Freescale's hundreds of Current Model ATEs forced Freescale to go back on its word and not deal with BSE.

214.     Teradyne's Lockout has resulted in BSE's inability to satisfy its customers' reconfiguration and service needs and has directly interfered with prospective business contracts. Because BSE cannot reliably obtain necessary components from Teradyne, and because Teradyne continues to condition servicing of Current Model ATEs and access to Teradyne state-of-the-art technology on not dealing with BSE on other lines of business, BSE's ability to make the commitments to prospective customers that are necessary to win their business has been severely impaired, and as a direct result of Teradyne's Lockout it has been unable to win business that it would otherwise have received.

215.     The foregoing relationships would have provided economic and other benefits to BSE but for Teradyne's tortious conduct.  Teradyne's conduct interfered with BSE's interest in reasonable expectations of economic advantage.

216.     Teradyne's interference was a direct and proximate cause of damages to BSE.  These damages include the loss of sale arrangements in the future, the loss of business goodwill, reputation, and diminution of business value, lost profits, devaluation of inventory value, the loss of the fair market value of sales made by Teradyne that would otherwise have been made by BSE, and exemplary damages, resulting from the malice and ill will with which Teradyne acted.

217.     Teradyne's interference has directly and proximately caused injury to BSE's business and property, as set forth above.

218.     Teradyne's unlawful conduct, unless restrained, will continue.  Unless the activities complained of are enjoined, BSE will suffer immediate and irreparable injury for which BSE is without an adequate remedy at law.

219.     BSE is entitled to a judgment that Teradyne has violated Massachusetts law and to the damages it suffered as a result of that violation.

## COUNT V

### (Tortious Interference with Existing Contracts)

220.     BSE incorporates by reference each of the allegations contained in Paragraphs 1 through 219 above as if fully set forth herein.

221.     This claim arises under Massachusetts law and seeks a judgment that Teradyne has tortiously interfered with BSE's contractual relations with its current customers.

222.     Prior to the wrongful conduct by Teradyne, BSE was a party to several contracts with various Chip Manufacturers, many of whom were repeat customers.  As of January 16, 2013, when Teradyne wrongfully refused any further dealings with BSE, BSE was responding to various bid requests, was in the process of reconfiguring Teradyne ATEs under current purchase orders, and was anticipating the fulfillment of orders for components placed and pending with Teradyne.

223.     As a result of the Lockout, BSE was precluded from completing some orders, bidding on new projects, and meeting delivery date commitments.  BSE has accordingly lost revenues from those existing orders and will continue to suffer economic harm in the future from the loss of these business relationships with Chip Manufacturers.

224.     At all relevant times and as amply demonstrated by the Lockout Notice, Teradyne acted intentionally, willingly, knowingly, and/or with malice to cause interference with BSE's contractual relationships, or knew that interference with these contractual relationships was certain to result from its conduct.  Despite Teradyne's knowledge that current bids, orders, and reconfiguration projects were pending at the time of its decision to impose the Lockout on BSE, it declined to grandfather existing projects.  This resulted in immediate hardship to BSE.  Similarly, Teradyne knew and knows of other contracts BSE has undertaken with its customers to provide parts and services.

225.    Teradyne acted intentionally and knowingly to interfere with BSE's contractual relationships.  In or around April 2012, Teradyne intentionally began to slow or hold up BSE purchase orders it knew were time-sensitive for BSE's customers.  For example, Teradyne delayed processing BSE's request to transfer an Encryption Key from one ATE to another, a simple data entry exercise.  Teradyne's delay in fulfilling BSE's purchase order caused BSE's customer, StatsChipPAC, to lose confidence in dealing with BSE on its contracts for reconfigured ATEs. More recently, Teradyne refused to allow BSE to access the Teradyne SSL to add Encryption Keys, something BSE was routinely permitted to do before the Lockout.  BSE's customer, Linear Technology, questioned whether BSE could perform its contractual commitments going forward.

226.    In addition, since January 16, 2013, BSE has requested quotes and attempted to place purchase orders with Teradyne on behalf of these and other customers, which Teradyne knew were for BSE's customers, and which Teradyne has refused.

227.    Teradyne's interference was a direct and proximate cause of damages to BSE.  These damages include the loss of sale arrangements in the past and in the future, the loss of business goodwill, reputation, and diminution of business value, lost profits, devaluation of inventory value, the loss of the fair market value of sales made by Teradyne's reconfiguration sales division that otherwise would have been made by BSE, and exemplary damages, resulting from the malice and ill will with which Teradyne acted.

228.    Teradyne's interference has directly and proximately caused injury to BSE's business and property, as set forth above.

229.    Teradyne's unlawful conduct, unless restrained, will continue.  Unless the activities complained of are enjoined, BSE will suffer immediate and irreparable harm for which BSE is without an adequate remedy at law.

230.     BSE is entitled to a judgment that Teradyne has violated Massachusetts common law and to the damages it suffered as a result of that violation.

## COUNT VI

### (Restraint of Trade and Tying in Violation of M.G.L. c. 93, §§ 4 and 5)

231.     BSE repeats and realleges the allegations contained in Paragraphs 1 through 230 as if fully set forth herein.

232.     Teradyne's actions and course of conduct are an unreasonable restraint of trade in violation of M.G.L. c. 93 §§ 4 and 5, by tying its provision of repair services to only those ATEs purchased directly from Teradyne.  Teradyne possesses or will soon possess monopoly power in the Locked-In Relevant Markets and in the Service Market.  Through the anticompetitive and exclusionary actions and courses of conduct alleged herein, Teradyne has willfully maintained, and unless restrained by the Court, will continue to willfully maintain that power by anticompetitive and unreasonably exclusionary actions and courses of conduct.

233.     Teradyne seeks, and has sought, to compel Chip Manufacturers to purchase reconfigured Teradyne ATEs exclusively from Teradyne, and to penalize customers who refuse to do so.  This conduct unreasonably restrains trade and restricts the ability of Teradyne's only global competitor, BSE, to compete—on the basis of price and/or quality—for such customers' business, thereby restraining competition in the Locked-In Relevant Markets.

234.     The purpose and effect of Teradyne's actions and course of conduct is to restrain trade and competition in the Locked-In Relevant Markets, in violation of M.G.L. c. 93 § 4.

235.     A further purpose and effect of Teradyne's actions and conduct is to unlawfully maintain its monopoly position in the Service Market for Teradyne ATEs, which is also in violation of M.G.L. c. 93 § 5.

236.    Teradyne's conduct constitutes a *per se* violation of the Massachusetts antitrust laws, and is, in any event, an unreasonable and unlawful restraint of trade.  The pro-competitive benefits, if any, associated with Teradyne's conduct, do not outweigh its actual and likely anticompetitive effects.

237.    The Locked-In Relevant Markets and the Service Market are separate and distinct relevant antitrust markets.  That is, there are separate degrees of supply and demand for the products and services in these respective markets.

238.    The purpose and effect of Teradyne's impermissible tying of these two markets is to prevent customers from purchasing reconfigured Teradyne ATEs from BSE on the merits and pricing and to foreclose BSE from its customers, thereby restraining competition in the Locked-In Relevant Markets.

239.    Teradyne's actions and course of conduct are a direct and proximate cause of damages to BSE.  These damages include the loss of sale arrangements in the future, the loss of business goodwill, reputation, and diminution of business value, lost profits, devaluation of inventory value, the loss of the fair market value of sales made by Teradyne as a result of the lack of competition from BSE, and exemplary damages, resulting from the malice and ill will with which Teradyne acted.

240.    Teradyne's actions and course of conduct in restraint of trade have directly and proximately caused injury to BSE's business and property, as set forth above.

241.    Teradyne's unlawful conduct, unless restrained, will continue.  Unless the activities complained of are enjoined, BSE will suffer immediate and irreparable injury for which BSE is without an adequate remedy at law.

242.    Pursuant to M.G.L. c. 93 § 12, BSE is entitled to an injunction against

Teradyne, preventing and restraining the violations alleged herein.  BSE is further entitled to treble

damages and attorneys fees because of Teradyne's malicious intent to injure BSE by its violative

actions.

## COUNT VII

### (Unfair Competition in Violation of M.G.L. c. 93A, §§ 2 and 11)

243.    BSE repeats and realleges the allegations contained in Paragraphs 1 through

242 above as if fully set forth herein.

244.    Teradyne, directly and/or through its agents, has engaged in unfair

competition and unfair and deceptive trade acts and practices in violation of M.G.L. c. 93A, §§ 2

and 11.  These violations include, without limitation, the following:

a.  Committing acts and courses of conduct which are unfair competition in violation

of M.G.L. c. 93A §§ 2 and 11, by tying its provision of repair services to only

those ATEs purchased directly from Teradyne.  Teradyne possesses or will soon

possess monopoly power in the Locked-In Relevant Markets and in the Service

Market.  Through the anticompetitive and exclusionary actions and courses of

conduct alleged herein, Teradyne has willfully maintained, and unless restrained

by the Court, will continue to willfully maintain that power by anticompetitive

and unreasonably exclusionary actions and courses of conduct.

b.  Compelling Chip Manufacturers to purchase reconfigured Teradyne ATEs

exclusively from Teradyne, and penalizing customers who refuse to do so.  This

conduct unreasonably restrains trade and restricts the ability of Teradyne's only

material competitor, BSE, to compete—on the basis of price and/or quality—for

such customers' business, thereby restraining competition in the Locked-In Relevant Markets.

c. Restraining trade and competition in the Locked-In Relevant Markets, in violation of M.G.L. c. 93A §§ 2 and 11.

d. Unlawfully maintaining Teradyne's monopoly position in the Service Market, which is also in violation M.G.L. c. 93A §§ 2 and 11.

e. Impermissibly tying two markets to prevent customers from purchasing reconfigured Teradyne ATEs from BSE on the merits and pricing and foreclosing BSE from its customers, thereby restraining competition in the Locked-In Relevant Markets.

f. Unreasonably restraining trade by tying its provision of repair services to only those ATEs purchased directly from Teradyne.  Teradyne possesses monopoly power in the Service Market.  Through the anticompetitive conduct alleged herein, Teradyne has willfully maintained, and unless restrained by the Court, will continue to willfully maintain, that power by anticompetitive, unfair, and unreasonably exclusionary conduct.

g. Interfering with BSE's existing contracts, and prospective contractual and business arrangements, with various Chip Manufacturers.

h. Precluding BSE from completing certain orders of Chip Manufacturers, bidding on new projects, and meeting delivery date commitments.  BSE has accordingly lost revenues from those existing orders and will continue to suffer economic harm in the future from the loss of these business relationships with Chip Manufacturers.

245.     At all times material and relative hereto, the events, transactions, and occurrences described herein occurred substantially and primarily within the Commonwealth of Massachusetts.

246.     Teradyne's conduct constitutes a violation of the Massachusetts unfair competition and consumer protection laws, and is, in any event, an unreasonable and unlawful restraint of trade.  The pro-competitive benefits, if any, associated with Teradyne's conduct do not outweigh its actual and likely anticompetitive effects.

247.     The violations of M.G.L. c. 93A, §§ 2 and 11, described above, were knowingly, willfully, and intentionally committed by Teradyne directly and/or by its agents, with purposeful callousness.

248.     Teradyne's violations of M.G.L. c. 93A have been a direct and proximate cause of damages to BSE.  These damages include the loss of sale arrangements in the future, the loss of business goodwill, reputation, and diminution of business value, lost profits, devaluation of inventory value, the loss of the fair market value of sales made by Teradyne as a result of the lack of competition from BSE, and exemplary damages, resulting from the malice and ill will with which Teradyne acted.

249.     Teradyne's interference has directly and proximately caused injury to BSE's business and property, as set forth above.

250.     Teradyne's unlawful conduct, unless restrained, will continue.  Unless the activities complained of are enjoined, BSE will suffer immediate and irreparable injury for which BSE is without an adequate remedy at law.

251.     Pursuant to M.G.L. c. 93A § 11, BSE is entitled to an injunction against Teradyne, preventing and restraining the violations alleged herein.  BSE is further entitled to treble

damages and attorneys' fees because of Teradyne's malicious intent to injure BSE by its violative actions.

## COUNT VIII

### (Mandatory Injunctive Relief)

252.     BSE repeats and realleges the allegations contained in Paragraphs 1 through 251 above as if fully set forth herein.

253.     BSE has a reasonable probability of success on the merits.

254.     BSE's right to relief in the form of access to essential Teradyne components is clear.

255.     As a result of Teradyne's unlawful conduct, as alleged herein, BSE will continue to suffer immediate and irreparable harm that cannot be fully remedied by money damages.

256.     BSE does not have an adequate remedy at law.

257.     Granting injunctive relief to BSE will not result in greater harm to Teradyne.

258.     Granting immediate injunctive relief to BSE will be in the public interest, as it will allow for greater competition in the sale of ATEs to Teradyne customers, thereby reducing the price of nearly all electronic products made and sold today throughout the United States.

259.     BSE is entitled to a mandatory immediate injunction pursuant to 15 U.S.C. § 26 and Fed. R. Civ. P. 65, requiring Teradyne to supply BSE with the components necessary for reconfiguring Teradyne ATEs on the same and similar terms available to others.

## COUNT IX

### (Declaratory Relief)

260.     BSE repeats and realleges the allegations contained in Paragraphs 1 through 259 above as if fully set forth herein.

261.     BSE seeks to purchase necessary components from Teradyne in order to compete in the Locked-In Relevant Markets.

262.     BSE has requested that Teradyne supply BSE with such components and BSE has made it clear that it is willing to pay Teradyne the full new list price for each of these components.

263.     Nevertheless, Teradyne has, since January 16, 2013, continuously refused to supply BSE with these components and claims a legal right not only to refuse to deal with BSE, but to restrict its customers from dealing with BSE, ensuring Teradyne's ability to prevent BSE from providing needed competition in the Locked-In Relevant Markets and the Service Market.

264.     Thus, a dispute currently exists between Teradyne and BSE with respect to Teradyne's right to refuse to deal with BSE.

265.     BSE is therefore entitled, pursuant to the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202, to a declaration of rights and obligations whereby Teradyne is precluded from refusing to deal with BSE, precluded from denying access to the essential components needed to reconfigure Teradyne ATEs, and precluded from enforcing agreements to restrict competition from BSE as alleged herein.

## RELIEF REQUESTED

WHEREFORE, Plaintiff BSE requests that this Honorable Court:

1.      Adjudge and decree that Teradyne has monopolized the Locked-In Relevant Markets in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

2.      Adjudge and decree that Teradyne has unlawfully tied its provision of repair services to its customers' agreement to purchase all reconfigured Teradyne ATEs from Teradyne in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

3.      Adjudge and decree that Teradyne has unlawfully engaged in exclusive dealing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

4.      Adjudge and decree that Teradyne has unlawfully interfered with BSE's prospective business and contractual relationships and existing contracts, in violation of Massachusetts state law;

5.      Adjudge and decree that Teradyne has unlawfully restrained trade and commerce in violation of Sections 4 and 5 of the Massachusetts Antitrust Act, M.G.L. c. 93, §§ 4 and 5;

6.      Adjudge and decree that Teradyne has engaged in unfair competition and unfair and deceptive trade acts and practices, in violation of Sections 2 and 11 of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, §§ 2 and 11;

7.      Award BSE damages in excess of $100 million;

8.      Award BSE treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, resulting from Teradyne's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, in an amount to be proven at trial;

9.      Award BSE damages, including, without limitation, compensatory, consequential and punitive damages, resulting from Teradyne's violations of Massachusetts state common law in an amount to be proven at trial;

10.     Award BSE treble damages pursuant to M.G.L. c. 93 § 12, resulting from Teradyne's violations of M.G.L. c. 93 §§ 4 and 5, in an amount to be proven at trial;

11.     Award BSE treble damages pursuant to M.G.L. c. 93A § 11, resulting from Teradyne's violations of M.G.L. c. 93A §§ 2 and 11, in an amount to be proven at trial;

12.     Permanently enjoin Teradyne, its officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, directly or indirectly, from refusing to deal with BSE regarding the sale of any component or part, or otherwise treating BSE differently from any other customer;

13.     Grant BSE a declaration that Teradyne's anticompetitive conduct is unlawful; and

14.     Award BSE its costs in this action, including attorneys' fees, and such other and further relief as may be just and proper.

## JURY DEMAND

BSE demands a trial by jury of all issues so triable.

Dated:  Boston, Massachusetts
       May 17, 2013

REED & GIORDANO, P.A.


By:_____

      Philip M. Giordano (BBO#193530)
      Lee E. Rajsich (BBO #676714)

      Giordano & Company, P.C.

      101 Tremont Street, Suite 900
      Boston, Massachusetts 02108-5005
      Tel: (617) 723-7755
      Pgiordano@reedgiordano.com
      Lrajsich@reedgiordano.com


HUGHES HUBBARD & REED LLP


By:_____

      Ethan E. Litwin
      Jeffrey R. Coleman
      Morgan J. Feder
      Karen Goldberg

      One Battery Park Plaza
      New York, New York 10004
      Tel: (212) 837-6000
      Litwin@hugheshubbard.com
      Coleman@hugheshubbard.com
      Feder@hugheshubbard.com
      Goldberk@hugheshubbard.com

      *Attorneys for Plaintiff Boston Semi*
      *Equipment LLC*

# EXHIBIT A



# Teradyne Severs Ties with Test Advantage, Microstats, BSE

**Do not sell testers, parts or services to Test Advantage, Microstats or BSE!**

**STOP**

In light of the recent business activities of the BSE Group, we have decided to discontinue all business with the BSE Group, LLC (parent company of Test Advantage and Microstats).

Please help enforce this policy by declining any requests from BSE/Test Advantage/Microstats, including:

- Pricing
- Technical Information
- Technical Support
- Software Licenses & Upgrades
- Spares & Replacement Parts

As a practical matter, if a Test Advantage-owned system is being leased by one of our customers, we will continue to provide our full range of support services to the end customer. This reflects our requirement that Tester Support Agreements must cover all systems of a common product family that are located at the same physical site.

# EXHIBIT B





600 Riverpark Drive, North Reading, MA 01864   |   p: 978.370.2700   |   www.teradyne.com

TERADYNE
Because Testing Matters

January 16, 2013

Via Email & Overnight Delivery

Bryan Banish
President & Chief Executive Officer
BSE Group, LLC
3 Burlington Woods, Suite 2
Burlington, MA 01803

Dear Bryan:

Please be advised that, in light of your recent business activity in Japan, we have decided to discontinue doing business with the BSE Group, LLC. We regret that you have chosen this path which leaves us no alternative other than to end our business relationship with your company.

Sincerely,

Michael J. Luttati
Vice President, Teradyne Semiconductor Test Division
SOC Business Group General Manager